IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| TOMMIE PATTERSON,<br><br>                Petitioner,<br><br>   vs.<br><br>WILLIAM LAPINSKAS, Superintendent,<br>Spring Creek Correctional Center,<br><br>                Respondent. | No. 3:20-cv-00007-JKS<br><br>ORDER<br>[Re: Motion at Docket No. 9]<br>and<br>MEMORANDUM DECISION |

Tommie Patterson, a state prisoner proceeding *pro se*, filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. Patterson is in the custody of the Alaska Department of Corrections ("DOC") and incarcerated at Spring Creek Correctional Center. Respondent has answered, and Patterson has not replied.

I. BACKGROUND/PRIOR PROCEEDINGS

Patterson was charged with the kidnapping and murder of Terrell Houngues. He was also charged with tampering with physical evidence and possessing a firearm capable of being concealed on one's person after having been convicted of a felony. The charging document alleged that, in early 2005, Houngues stole nine ounces of cocaine from Mario Page, an Anchorage drug dealer. Patterson served as Page's right-hand man and enforcer. According to the charging document, Patterson and his girlfriend, Kira Gray, participated in a plot organized

-1-

by Page to kidnap Houngues, take him to a remote location, and kill him. Patterson pled not guilty and proceeded to a jury trial, at which four witnesses (Sherman Johnson, James Hendrickson, Scott Ramsay, and James Freitas) testified that Patterson murdered Houngues. On direct appeal of his conviction, the Alaska Court of Appeals recounted the following facts underlying the testimony and circumstantial evidence presented at trial:

> The following description of Patterson's case is drawn from the evidence presented at his trial, viewed in the light most favorable to the jury's verdicts. Patterson did not present any evidence to affirmatively contradict this view of events, but during the cross-examination of the State's witnesses, Patterson's attorney brought up several potential reasons why these witnesses might be doubted.
> As we mentioned at the beginning of this opinion, Terrell Houngues stole nine ounces of Page's cocaine in early 2005. Page and Patterson were in California at the time, trying to establish a relationship with a new supplier. Page had left his supply of drugs in the possession and care of his girlfriend, Kira Gray. Houngues knew Gray (and was able to obtain access to the cocaine) because he was living with Gray's sister.
> When Page found out about the theft of his cocaine, he blamed Gray. Gray offered to "make [things] right" by enticing Houngues to accompany her to a remote location, so that Page and Patterson could exact revenge on Houngues.
> Patterson was Page's "muscle" or enforcer. He habitually carried a .40 caliber Springfield Armory XD 40 semi-automatic pistol. According to one of Patterson's friends, this pistol was Patterson's "pride and joy".
> On the morning of May 8, 2005, Gray met with Page, Patterson, and another friend named Frederick Sherman Johnson. Pursuant to the plan, Gray telephoned Houngues: she told him that Page had just beaten her. Gray also told Houngues that she knew where Page kept his drugs, and she implied that she planned to get even with Page. When Gray invited Houngues to accompany her, Houngues accepted.
> Gray took Mario Page's car—a red Cadillac—and went to pick up Houngues; then they drove to the Matanuska–Susitna Valley, past Wasilla and on toward Houston. Unbeknownst to Houngues (but known to Gray), Page, Patterson, and Johnson were following them at a distance in a white Kia that had been loaned to them by Sherman Johnson.
> (This white Kia was owned by Kanika Jackson. Jackson was the girlfriend of James Hendrickson, who was a friend of Sherman Johnson's.)
> During the drive, Gray kept in contact with the men in the Kia by cell phone: Gray used the cell phone that belonged to her and Page, while the men in the Kia used Patterson's cell phone.
> By pre-arrangement, Gray drove to a spot where the men in the Kia would be waiting for them. Page and Patterson, who were armed with handguns, forced Houngues into the trunk of the Kia, and then Page drove the Kia down a dirt road, away from the Parks highway. Patterson was in the front passenger seat, next to Page. Johnson was sitting in the back seat with Gray. Gray also had a handgun.
> When they arrived at a suitably remote place, Page, Patterson, and Gray got out of the car and removed Houngues from the trunk. Johnson, who now realized that Houngues was about to be killed, decided that he would stay in the car—because he "really didn't want no part of what was about to happen."
> Page, Patterson, and Gray all began asking Houngues questions-primarily, asking him what had happened to the nine ounces of cocaine. Houngues protested that he had

had nothing to do with the theft of the cocaine. At this point, Gray shot him in the leg. When Houngues began jumping around in pain, Page told Gray to "get him to shut up". Gray then shot Houngues several more times. Houngues was prostrate on the ground, but he was still "twitching a little bit" according to Johnson, so Patterson stood over Houngues's body and emptied his gun into Houngues.

When this murder was completed, Page, Patterson, and Gray got back into the car, and they started driving back to Anchorage. However, Page decided to make a stop so that they could get rid of the two guns that were used in the shooting: Gray's .38 caliber Lady Smith revolver, and Patterson's .40 caliber semi-automatic Springfield Armory XD 40.

Page drove to Bear Paw Lake. (He was familiar with this lake because he had previously lived in a residence located by the lake.) When they got to the lake, Patterson took the two guns (the .38 revolver and his own .40 caliber semi-automatic) and wiped them down with his shirt. Patterson then threw these guns into the lake. Before Patterson threw his .40 caliber pistol into the lake, he removed the ammunition clip from the gun and threw the clip into the lake separately.

(Page was carrying a third gun—a .45 caliber "Desert Eagle"—but that gun was not used in the shooting, so it was not thrown into the lake.)

When they got back to Anchorage, they went to the home of James Freitas. Freitas was Page's main drug courier; he would bring large quantities of drugs to Alaska so that Page could sell the drugs. Page and Freitas were quite close: Freitas testified that he loved Page like a son, and that Page would call him "Dad".

Freitas could tell from their demeanor that something had happened. Patterson told Freitas that he "emptied a clip in a guy" after Gray shot the man first.

Later that morning, Johnson and Patterson took the Kia to a car wash, and then they returned the Kia to James Hendrickson. Hendrickson, in turn, brought the car back to its owner—his girlfriend, Kanika Jackson.

When Jackson got the Kia back, she noticed that the car had been washed and the interior of the car had been "cleaned out"—or, at least, it had apparently been cleaned out. But when Jackson was driving the car, she dropped her cell phone onto the floorboard, and when she reached down to pick up her cell phone, she discovered a bag of bullets and some empty shell casings on the floorboard. Jackson identified the empty shell casings as .40 caliber.

Following this discovery, Jackson called her boyfriend, Hendrickson, to ask him about these items. A little later, Tommie Patterson arrived to retrieve the bullets and the casings from Jackson.

Several days later, Mario Page decided that they should burn the Kia-because this car could conceivably provide physical evidence to link them to the scene of the murder. Page, Patterson, and Johnson assembled to perform this job. Johnson helped to pour gasoline on the exterior of the car, and Patterson broke one of the Kia's windows and threw gasoline inside the car. Then Patterson set the car on fire. Unbeknownst to the three men, this act of arson was witnessed by Timothy Hoffman, a man who lived in a nearby apartment.

Later, Johnson and Patterson burned the articles of clothing they had been wearing when they set fire to the Kia.

Several months after these events, the state troopers' investigation into the murder began to bear fruit. In particular, the troopers identified Sherman Johnson as one of the participants, and they interviewed him. Initially, Johnson told the troopers that he had not witnessed Houngues's death, and that he knew nothing about any plan concocted by Page, Gray, and Patterson. But Johnson ultimately decided to cooperate with the State in exchange for the State's promise not to prosecute him as an accomplice to the kidnapping and murder.

-3-

> Based on Johnson's description of how the two handguns used in the murder had been thrown into the lake, the troopers searched Bear Paw Lake in May 2006 (i.e., about a year after the murder). They recovered the .38 caliber Lady Smith revolver and the .40 caliber Springfield Armory semi-automatic.
> A firearms expert at the State Crime Laboratory concluded that the .40 caliber bullets recovered from Houngues's body and from the crime scene were fired from Patterson's Springfield Armory pistol. (With regard to the .38 caliber bullets, the firearms expert could say only that they could have been fired from the .38 caliber Lady Smith revolver recovered from the lake. These bullets had the same pattern of lands and grooves as the revolver, but they did not have sufficient individual identifying characteristics to allow the firearms analyst to say that they were definitely fired from this particular gun.)
> After Patterson was arrested, he made statements about the murder to two men.
> The first of these men was Scottie Ramsey, who was an acquaintance of Page and Patterson. Patterson told Ramsey that he had participated in a murder that was committed "over stolen drugs". Patterson explained that "they" all drove out to the Mat–Su Valley, that Kira Gray shot the victim first, and then he (Patterson) shot him after that. Patterson also told Ramsey that Gray used a revolver, while he used a .40 caliber pistol. Patterson also mentioned that they had burned the car afterwards.
> According to Ramsey, Patterson was upset with Page and Gray because he found out that they had been talking about the homicide. Patterson declared that "the one mistake he made was . . . leaving [only] one body and not four."
> Patterson also described the shooting to James Hendrickson, a long-time friend of his. According to Hendrickson's statement to the state troopers, Patterson told Hendrickson that he was the one who shot Houngues—that first "the girl" shot Houngues, but Houngues was still moving or twitching, and this bothered Patterson, so he walked over and shot Houngues some more.

*Patterson v. State*, No. A-10220, 2011 WL 2518952, at *1-4 (Alaska Ct. App. Jun. 22, 2011).

At the conclusion of trial, the jury found Patterson guilty of first- and second-degree murder and kidnapping.[1] The jury found Patterson not guilty on one charge of tampering with evidence, and could not reach a verdict on the other tampering charge or the firearm possession charge. Through counsel, Patterson appealed his conviction, arguing that the trial court erred by: 1) permitting the jurors to ask an investigating police officer whether he personally believed that Sherman Johnson was telling the truth about how the murder had occurred; and 2) allowing the State to repeatedly characterize Patterson as dangerous, "crazy" and a "bad influence." The Court of Appeals unanimously affirmed the conviction against Patterson, finding that the trial court did not commit plain error as to either of Patterson's contentions, in a reasoned, unpublished opinion issued on June 22, 2011. *Patterson*, 2011 WL 2518952, at *12. Patterson

---

[1] Page and Gray were ultimately also convicted, in separate trials, of the murder and kidnapping.

-4-

raised his claims in a counseled petition for review in the Alaska Supreme Court, which was denied without comment on August 24, 2011.

Patterson then filed in the Alaska Superior Court a *pro se* application for post-conviction relief. *Patterson v. State*, Case No. 3PA-12-01630CI. After counsel was appointed, Patterson filed an amended application asserting that trial counsel provided ineffective assistance by advising Patterson not to testify and failing to call certain witnesses at trial. The trial court held an evidentiary hearing on the motion, at which both Patterson and trial counsel testified. At the conclusion of the hearing, the Superior Court found credible the testimony of trial counsel and concluded that Patterson failed to demonstrate that he was prejudiced by counsel's actions or that he was unduly prevented from testifying on his own behalf. Patterson appealed the adverse determination to the Court of Appeals, which affirmed the Superior Court's rejection of Patterson's claim in a reasoned, unpublished opinion issued on November 28, 2018. *Patterson v. State*, No. A-12592, 2018 WL 6199032, at *1 (Alaska Ct. App. Nov. 28, 2018). Patterson filed a petition for hearing in the Alaska Supreme Court, which was summarily denied on February 5, 2019.

Patterson timely filed a *pro se* Petition for a Writ of Habeas Corpus to this Court dated January 2, 2020. Docket No. 1 ("Petition"); *see* 28 U.S.C. § 2244(d)(1),(2).

## II. GROUNDS/CLAIMS

In his *pro se* Petition before this Court, Patterson argues that: 1) his conviction is void because witness Sherman Johnson perjured himself at trial; 2) he was deprived of due process and a fair trial when the trial court allowed one prosecution witness to vouch for the veracity of another; 3) the trial court admitted improper character evidence; and 4) his trial counsel rendered ineffective assistance by failing to: a) provide him with discovery, b) file "numerous motions," c) move for a judgment of acquittal, and d) adequately prepare for sentencing.

## III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000). The term unreasonable is a common term in the legal world. The Supreme Court has cautioned, however, that the range of reasonable judgments may depend in part on the nature of the relevant rule argued to be clearly established federal law. *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.").

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision." *Id.* at 412. The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002). Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S.

-6-

Case 3:20-cv-00007-JKS   Document 19   Filed 10/01/20   Page 6 of 10

Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). A summary denial is an adjudication on the merits and entitled to deference. *Harrington v. Richter*, 562 U.S. 86, 99 (2011). Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

Patterson has not replied to Respondent's answer. The relevant statute provides that "[t]he allegations of a return to the writ of habeas corpus or of an answer to an order to show cause in a habeas corpus proceeding, if not traversed, shall be accepted as true except to the extent that the judge finds from the evidence that they are not true." 28 U.S.C. § 2248; *see also Carlson v. Landon*, 342 U.S. 524, 530 (1952). Where, as here, there is no traverse filed and no evidence offered to contradict the allegations of the return, the court must accept those allegations as true. *See Phillips v. Pitchess*, 451 F.2d 913, 919 (9th Cir. 1971).

IV. DISCUSSION

In his answer to the Petition, Respondent moves to dismiss the instant Petition as untimely. Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), there is a one-year limitations period in which a state prisoner may file a federal habeas petition challenging his or her state conviction:

> A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of-
>
> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> ... or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).

Under the statute, "[t]his one-year limitations period is tolled during the pendency of a 'properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim.'" *Mardesich v. Cate*, 668 F.3d 1164, 1169 (9th Cir. 2012). The Supreme Court explains that "[t]he time that an application for state post-conviction review is 'pending' includes the period between (1) a lower court's adverse determination, and (2) the prisoner's filing of a notice of appeal, provided that the filing of the notice of appeal is timely under state law." *Evans v. Chavis*, 546 U.S. 189, 191 (2006) (emphasis in original) (citation omitted); *id.* at 192 ("If the filing of the appeal is timely, the period between the adverse lower court decision and the filing (typically just a few days) is not counted against the 1-year AEDPA time limit."); *but see Mitchell v. Valenzuela*, 791 F.3d 1166, 1171 (9th Cir. 2015) (the statute of limitations is not tolled, however, while an unexhausted petition under § 2254 is pending in federal court) (citing *Rhines v. Weber*, 544 U.S. 269, 274-75 (2005)). Thus, if Patterson has been timely and properly challenging his conviction in the state courts, the statute of limitations is tolled during any state proceedings.

In support of his motion to dismiss, Respondent provides records of the Alaska state courts that reflect that the Alaska Supreme Court denied Patterson's petition for hearing on direct appeal on August 24, 2011. Docket Nos. 9 at 22, 8-6 at 45. As Respondent notes in its answer, Patterson's conviction became final on direct review 90 days later, when the time to file a petition for *certiorari* in the U.S. Supreme Court expired on November 22, 2011. *See Jiminez v.*

-8-

*Quarterman*, 555 U.S. 113, 119 (2009); *Spitsyn v. Moore*, 345 F.3d 796, 798 (9th Cir. 2003). The one-year AEDPA statute of limitations therefore began to run on November 22, 2011. 28 U.S.C. § 2244(d)(1)(A).

When Patterson filed his post-conviction relief application in Alaska Superior Court on May 25, 2012, 185 days of the one-year statute of limitations had run. Because Patterson's post-conviction relief application was properly filed, the AEDPA statute of limitations was tolled from May 25, 2012, until February 15, 2019, when the Alaska Supreme Court denied his petition for hearing on his post-conviction relief application, Docket No. 8-9 at 31. The statute of limitations began to run again, however, after the Supreme Court's denial on February 15, 2019. At that time, Patterson had 180 days left to file his federal habeas petition under the AEDPA, since 185 untolled days of the 365-day period had already elapsed before he filed his state post-conviction relief action. Patterson thus had until August 14, 2019, to timely file the instant action. Patterson did not file the instant Petition until January 2, 2020. Docket No. 1. As the Court explained in its previous Order, the instant Petition is therefore facially untimely. Docket No. 16 at 3 ("Order").

In that Order, the Court explained that Patterson must show either that, contrary to the records submitted by Respondent, his § 2254 petition has been timely filed within the one-year statute of limitations, *or* that he is entitled to equitable tolling. The Court additionally explained that, to show that equitable tolling is warranted, Patterson must explain whether he: 1) has been pursuing his rights diligently, *and* 2) has had some extraordinary circumstance(s) that stood in his way and prevented timely filing, and he must state the time period during which those circumstances prevented him from filing his habeas petition. Patterson did not reply to Respondent's answer/motion to dismiss or this Court's Order. Accordingly, this Court must, as it cautioned Patterson in the Order, grant Respondent's motion at Docket No. 9 and dismiss with prejudice as untimely the instant Petition. *See Herbst v. Cook*, 260 F.3d 1039, 1043 (9th Cir. 2001).

-9-

## V. CONCLUSION AND ORDER

Patterson's Petition is untimely, and he has failed to show that he is entitled to equitable tolling.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DISMISSED WITH PREJUDICE AS UNTIMELY**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability. *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)). Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals. *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: October 1, 2020.

                                                s/James K. Singleton, Jr.
                                                JAMES K. SINGLETON, JR.
                                                Senior United States District Judge